[Civ. No. 38365. First Dist., Div. Two. Apr. 5, 1977.]

PACIFIC GAS AND ELECTRIC COMPANY,
Plaintiff, Cross-defendant and Respondent, v.
WILLIAM G. HAY, JR., et al., Defendants,
Cross-complainants and Appellants.

906

**COUNSEL**

Kronick, Moskovitz, Tiedemann & Girard and Frederick G. Girard for Defendants, Cross-complainants and Appellants.

Charles T. Van Deusen, Charles W. Thissell, Jack F. Fallin, Jr., and F. Ronald Laupheimer for Plaintiff, Cross-defendant and Respondent.

## OPINION

**TAYLOR, P. J.**—This is an appeal[1] by several owners of real property (hereafter collectively referred to as Hay) from a judgment denying relief on their amended cross-complaint seeking damages for inverse condemnation, and malicious infliction of pecuniary harm in a condemnation action initiated by Pacific Gas and Electric Company (hereafter PG&E) and subsequently abandoned. We have concluded that there was sufficient evidence to support the trial court's findings and conclusions that the condemnation action was filed in good faith and was reasonable and fully justified by the circumstances, and that Hay's only remedy was the recovery of its costs and disbursements in the condemnation proceeding pursuant to former Code of Civil Procedure section 1255a, subdivision (c).

The findings and record reveal the following chronology of pertinent facts:

In August 1971, PG&E filed a plant construction application for its proposed Mendocino nuclear power plant with the appropriate federal agency, then the Atomic Energy Commission[2] (hereafter AEC), and in November 1971, with the California Public Utilities Commission (hereafter PUC). The process for securing a nuclear construction permit from the AEC was initiated by the filing of an application accompanied by a seven- to eight-volume "preliminary safety analysis and the applicant's environmental data statement." The ordinary process was a review of the safety analysis by the AEC staff, followed by the staff's submission to the applicant of a series of questions designed to clarify certain points or to prompt further investigation.

---

[1] The notice of appeal is properly taken from both the judgment of July 28, 1975, denying relief on the cross-complaint and the order and judgment of September 23, 1974, dismissing the abandoned condemnation action and awarding Hay $7,521.32 pursuant to former Code of Civil Procedure section 1255a, subdivision (a), now Code of Civil Procedure section 1268.510, subdivision (a). The latter is a final judgment (*Oak Grove School Dist.* v. *City Title Ins. Co.,* 217 Cal.App.2d 678, 696 [32 Cal.Rptr. 288]; cf. 4 Witkin, Cal. Procedure (2d ed.) Judgment, § 17, p. 3193).

[2] In 1974, the AEC was abolished and its nuclear facility licensing and related functions were transferred to the Nuclear Regulatory Commission (42 U.S.C.A. §§ 5814 and 5843).

In 1971, Hay submitted to the county planning commission a tentative subdivision map dividing the property into 10-acre parcels; approval was likely. However, on May 3, 1972, PG&E filed its condemnation complaint to acquire a 900-foot-long easement for power transmission by 28 steel towers to be constructed along 130.593 acres of Hay's property. In June, PG&E notified the county planning department of the action against Hay. As the easement traversed the center of its property, Hay withdrew the subdivision map on June 12, 1972.

In May 1972, PG&E's construction schedule required that one transmission line be operational by August 1973[3] to provide construction power. In addition, the installation of at least one additional line had to be commenced by December 1973 to transmit power for pre-operational testing. This schedule allowed a 15-month period for the acquisition and installation of the first line and 19 months for the commencement of the construction of the additional line. PG&E's standard procedure based on experience was to allow at least 12 to 18 months from the filing of a condemnation action to the securing of the order of possession.

PG&E's prior experience indicated that a two-year period was a reasonable time for the issuance of an AEC construction permit. At the time of the filing of the condemnation action, the questions submitted by the AEC about seismology and geology represented a normal part of the application process for a coastal site. In April 1972, the AEC and its consultants performed a field investigation at the plant site that left PG&E "quite optimistic" about seismological issues.

In September 1972, representatives of the United States Geological Survey (hereafter USGS), acting as consultant to the AEC, specifically advised PG&E that certain geophysical problems, unless resolved, could result in denial of the AEC construction permit. In October 1972, PG&E prepared and submitted to the AEC an extensive program to resolve the geophysical problems.

In January 1973, USGS advised the AEC that the investigative techniques were incapable of predicting the geological safety of the site. After receiving this information, PG&E withdrew its application for the Mendocino plant and in April 1973, filed an abandonment of the condemnation action against Hay. Hay made no effort to set aside the abandonment and thereafter duly obtained costs, attorney fees and

---

[3]The August 1973 date represented an adjustment based on the AEC's review time and supplemental question process.

appraisal fees pursuant to former Code of Civil Procedure section 1255a, subdivision (c). The condemnation action was dismissed on September 23, 1974.

As there had been a change in county policy during the intervening period, Hay was precluded from resubmitting the 10-acre subdivision. In 1973, Hay submitted and received approval for a subdivision map for parcels in excess of 20 acres. Hay's amended cross-complaint sought compensatory and punitive damages in inverse condemnation and tort as a result of PG&E's alleged wilful and reckless filing of the condemnation action while the permit was still pending with the AEC, and the loss of value and other damages sustained as the result of Hay's inability to subdivide the property into 10-acre lots.

The court found, so far as here pertinent, that PG&E's filing of the condemnation proceeding did not give rise to any inverse condemnation liability. The issuance of construction permits and certificates from the PUC and the AEC were not a prerequisite for PG&E's filing of a valid condemnation proceeding. The damages asserted by Hay, based on alleged attitude changes within local planning agencies which Hay declined to test, are too speculative to form a basis for recovery in inverse condemnation. Hay's alleged loss in value as a result of a general change in regulatory attitude over time was not occasioned by any action or inaction on PG&E's part, and is not recoverable.

Hay's major contentions on appeal are that: 1) PG&E was not authorized to commence the eminent domain action since it could not fairly anticipate that the Hay property would be used to transmit electricity from the proposed nuclear plant; and 2) the trial court's failure to make specific findings of fact on the issue of PG&E's authority to condemn the property constituted reversible error. We cannot agree.

Before Hay's property could be condemned pursuant to former Code of Civil Procedure section 1241,[4] then applicable, PG&E was required only to establish that the taking was for a use authorized by law and that the taking was necessary to the public use. Hay concedes that the use was one authorized by law, but argues that the property was not *necessary* for

---

[4]Former Code of Civil Procedure section 1241 was repealed by Statutes of 1975, chapter 1275, section 1, operative July 1, 1976, reenacted as Code of Civil Procedure sections 1240.030, 1245.230 and 1245.240; the new Eminent Domain Law enacted by Statutes of 1975, chapter 1275, section 2, became operative July 1, 1976.

that use as PG&E failed to prove that the property would ever be used for the proposed purpose.

■ Hay maintains that since it could not have been "fairly anticipated" that PG&E would obtain the necessary AEC approval, a mandatory condition precedent to the accomplishment of its proposed use, PG&E lacked the requisite authority pursuant to former Code of Civil Procedure section 1241. However, pursuant to that statute, the considerations relevant for the determination of necessity are liberally construed and can include "immediate future needs [citation], other available facilities [citations], or public economic considerations [citations]" (*City of Hawthorne* v. *Peebles,* 166 Cal.App.2d 758, 762 [333 P.2d 442]). Necessity is a question of fact (*City of Los Angeles* v. *Cole,* 28 Cal.2d 509, 512 [170 P.2d 928]). In shedding light on future needs, *San Diego Gas & Elec. Co.* v. *Lux Land Co.,* 194 Cal.App.2d 472 [14 Cal.Rptr. 899], indicated, at page 480: ■ "The right of a public utility to acquire property through eminent domain proceedings for a public use, although not limited to its present needs, extends only to those future needs which are *fairly anticipated.*" (Italics supplied.)

Hay's argument is predicated on *San Diego Gas & Elec. Co., supra,* and *Pacific Gas & Electric Co.* v. *Parachini,* 29 Cal.App.3d 159 [105 Cal.Rptr. 477]. In the *San Diego* case, the utility sought a wider easement to cover the possibility of a need sometime in the future but had no present plans or prospective plans to use the easement for that purpose. The portion of the condemnation judgment relating to the wider easement was stricken for insufficiency of the evidence. In *Parachini, supra,* the dispute focused on a 150-foot-wide power transmission easement parallel to a 200-foot easement sought by PG&E to be used to transmit electricity from the third additional generating unit of its Diablo Canyon project. The condemnee opposed the taking on the ground that PG&E's proposed installation of a second transmission line on the additional easement and proposed third generating unit had not yet been approved by the AEC. The third generating unit was in the same location as the first one, which had been approved by the AEC and was then in the process of construction. The uncontroverted evidence established that there was every reason to expect that the regulatory agencies would approve the construction of the additional generator and transmission lines as the need for additional power approached (*Parachini, supra,* p. 165). The court held that PG&E could condemn the 150-foot parallel easement as it could be "fairly anticipated" that the public use would, in fact, occur.

Hay urges that since here, there had been no federal or state approval of any part of the proposed Mendocino plant, there is no evidence to indicate that approval was "fairly anticipated." The record, however, indicates that prior to the filing of the condemnation action against Hay, PG&E had submitted to the AEC an extensively researched proposal detailing the projected nuclear power plant and the schedule for its construction. The showing of need was specific and in response to growth demands. After the April 1972 field investigation of the site by the AEC and its consultants, PG&E was "optimistic" as to a resolution of the seismological issues. PG&E's complaint against Hay was filed in May. PG&E was first notified of the potential denial of the permit in September 1972. In October, PG&E prepared and presented another plan to the AEC.

 In any event, *Parachini* supports the view that agency approval is *not* a condition precedent to the commencement of a condemnation proceeding. The court said at page 166: "Contrary to defendants' view, a certificate from the Public Utilities Commission is not a condition precedent to the acquisition of property by a regulated utility. As the history of this case illustrates, four years or more may elapse between the filing of a complaint and a final judgment in a right-of-way case. The Public Utilities Commission may not wish to commit itself by the issuance of a certificate of public convenience and necessity so far in advance of actual construction. Rather, the commission may prefer to base its decision upon economic, technological and environmental circumstances as they appear closer to the time of construction.

"The Public Utilities Commission of California has taken the position that it does not wish to issue certificates before rights of way are acquired. In its decision No. 77301 (discussed *supra*), the commission said '. . . It must be recognized, however, that long-term planning may require acquisition of easements well in advance of need. Certification of rights of way or easements does not appear to be desirable.' " This reasoning applies equally to a construction permit from the federal regulatory agency. We hold, therefore, that the acquisition of the necessary construction permit was not a condition precedent to the commencement of a condemnation proceeding pursuant to the former statutes.[5]

---

[5]Of course, we do not reach the question of whether this is also true under the present statute, which permits the utility to secure immediate possession upon making the required showing (Code Civ. Proc., § 1255.410).

In addition, the commencement of a condemnation action does not unconditionally bind the condemner, as it has the right to abandon the action (former Code Civ. Proc., § 1255a). The abandonment mechanism provides the condemner with an appropriate method for discontinuing a proposed acquisition where circumstances indicate that the property is no longer necessary or desirable.

■ A factual showing of absolute necessity is *not* required. One need only show a reasonable or practical necessity which combines the greatest benefit to the public with the least inconvenience and expense to the condemning party and the property owner (*City of Hawthorne* v. *Peebles,* 166 Cal.App.2d 758 [333 P.2d 442]). The trial court here properly found necessity as: 1) PG&E's construction schedule was reasonable; 2) at the time the eminent domain action was filed, PG&E reasonably believed that its schedule would be met; and 3) the action was filed in good faith.

■ Hay, however, asks us to extend to the condemnation proceeding itself the theory of *Klopping* v. *City of Whittier,* 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345]. *Klopping* held that unreasonable or oppressive *pre*condemnation conduct which resulted in a diminution in market value could give rise to an action in inverse condemnation. Our Supreme Court discussed former Code of Civil Procedure section 1255a, subdivision (c), which provides that the condemnee be reimbursed for some of his costs and expenses incurred in connection with eminent domain proceedings in instances in which the condemner has not detrimentally relied on the condemnation. The court pointed out that this provision attempts to protect a property owner from those expenses incurred in preparing a defense to a condemnation action which has become unnecessary because of the abandonment, but makes no mention of reimbursement for decreases in market value. As the constitutional standard[6] for compensation in condemnation proceedings is just compensation measured by market value, and as an unreasonable delay in eminent domain action following precondemnation announcement or by other oppressive actions *prior* to condemnation[7] may result in

---

[6]California Constitution, article I, section 19, adopted November 5, 1974, previously section 14, repealed November 5, 1974.

[7]Although Hay objected to some of PG&E's precondemnation conduct below, these matters were resolved by the court and have concededly been abandoned on appeal.

a diminution in market value, the court concluded that section 1255a's silence on recovery for decreases in market value did not prevent compensation under these circumstances (*Klopping, supra,* pp. 43-52). The court based its decision on constitutional concerns over property rights.

As we have found that Hay's property was necessary for the proposed use and, therefore, the condemnation action was reasonably and in good faith brought, we are not faced with similar constitutional questions here. We think that *if* there is any form of liability beyond the statute for other than precondemnation activities, it could arise only under the *Klopping* standard of unreasonable or oppressive conduct. Hay has not pointed to any evidence in the record that demonstrates unreasonable or oppressive conduct, or argued that the court's finding that there was no oppressive conduct of any kind on the part of PG&E as to any issue is not supported by substantial evidence, as in *San Diego Gas & Elec. Co.* v. *Lux Land Co.,* 194 Cal.App.2d 472 [14 Cal.Rptr. 899].

In addition, subsequent to *Klopping,* our Supreme Court held that no inverse condemnation liability arises from a city's general plan that projected a specific street across the plaintiff's property (*Selby Realty Co.* v. *City of San Buenaventura,* 10 Cal.3d 110 [109 Cal.Rptr. 799, 514 P.2d 111]). While *Selby* was based on the fact that the general plan placed no direct restraint on land use and was subject to change, the court (at pp. 118-119) distinguished *Klopping* and noted the potential damage to reasoned planning inherent to an indiscriminate application of the *Klopping* theory.

█ Hay also contends that the judgment must be reversed as the findings of fact fail to resolve the material issue of whether it could have been fairly anticipated that PG&E would receive the necessary construction permit from the AEC. This argument is without merit as it is well settled that if the findings support the judgment, it will be affirmed. Findings of fact resemble special verdicts upon the issues of fact involved in the action (Cal. Civil Procedure During Trial (Cont.Ed.Bar 1960) § 21.21, p. 539). The trial court found that the eminent domain action was filed "in good faith, without malice, and the filing of that action was reasonable and fully justified by the circumstance," and that

"the eminent domain action and timing of its abandonment were reasonable." These findings are sufficient to support the judgment and were adequately supported by the evidence.

Affirmed.

Kane, J., and Rouse, J., concurred.